Jose L. Patiño (State Bar No. 149568)
jlpatino@jonesday.com
Amanda Pushinsky (State Bar No. 267950)
apushinsky@jonesday.com
JONES DAY
12265 El Camino Real
Suite 200
San Diego, CA  92130
Telephone:   858.314.1200
Facsimile:    858.314.1150

Attorneys for Plaintiff SOCIETÀ ITALIANA CHIMICI SRL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOCIETÀ ITALIANA CHIMICI SRL, an Italian limited liability company,<br><br>            Plaintiff,<br><br>     v.<br><br>eBIOSCIENCE CORPORATION, a California corporation,<br><br>            Defendant. | CASE NO. **10-CV-0630-BTM (WVG)**<br><br>**[CORRECTED] VERIFIED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Società Italiana Chimici Srl ("S.I.C."), by its undersigned counsel, respectfully alleges as follows for its verified complaint against eBioscience Corporation ("eBioscience"):

**NATURE OF ACTION**

1.      S.I.C. brings this action to specifically enforce eBioscience's contractual commitment to distribute its products in Italy exclusively through S.I.C., and to remedy financial and reputational harm suffered by S.I.C. from eBioscience's: (a) breach of that commitment, (b) interference with S.I.C.'s economic relationships, and (c) wrongful disparagement of S.I.C.

**THE PARTIES**

2.      Plaintiff S.I.C. is an Italian limited liability company with its principal place of business in Rome, Italy.

SDI-11823v1

**VERIFIED COMPLAINT**

3.      Defendant eBioscience is a California corporation with its principal place of business in San Diego, California.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds, exclusive of interest and costs, $75,000, and the controversy is between a citizen of a foreign state and a citizen of the State of California.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because eBioscience is resident in this district, transacts business in this district, and is subject to personal jurisdiction in this district.

## COMMON FACTUAL ALLEGATIONS

6.      S.I.C. has been selling various product lines to biological, medical and life science research institutions, including hospitals, laboratories, scientists and university professors, since 1957.  This customer base is relatively small in Italy, and it is a conservative, sophisticated and difficult clientele to commit to new products and services.  eBioscience sells specialized flow cytometry products around the world which is attractive to this same customer base S.I.C. has served for many years in Italy.  eBioscience was having difficulty penetrating this discerning market in Italy when it approached S.I.C. in 2003 for assistance.  At the time that S.I.C. began representing eBioscience in Italy, eBioscience was happy to have S.I.C. sell 300 Euros in product in Italy.  At great effort and expense, including leveraging its long-standing relationships to overcome the resistance of this notoriously conservative and cautious customer group, S.I.C. expanded the sales of eBioscience products in Italy to more than 570,000 Euros for the period July 2007 through July 2008.

7.      To encourage an even greater commitment of resources by S.I.C. in support of eBioscience products, eBioscience entered into a new Distribution Agreement, effective as of September 23, 2008, appointing S.I.C. the exclusive distributor for eBioscience products in Italy through September 22, 2011.  A true and correct copy of the Distribution Agreement is attached as Exhibit 1.

8.      The term of the Distribution Agreement is three years and can be terminated early only in very limited circumstances. (*See* Ex. 1, §§ 11-12.) Only in the event that "the other party failed to perform or otherwise breaches any of its obligations" under the Distribution Agreement may "[e]ither party" terminate the Distribution Agreement. (*Id.* § 12(d).) In reliance on, among other things, this exclusive relationship, the three-year time horizon, and the limited grounds for termination of the Distribution Agreement, S.I.C. expanded its investment in the marketing of eBioscience products. For example, S.I.C. spent more than 23,000 Euros to have an eBioscience booth at the Conference of the Italian Cancer Society and at a conference sponsored at the University of Urbino in the first twelve months following execution of the Distribution Agreement.

9.      S.I.C.'s efforts as an exclusive distributor for eBioscience were successful. In the first twelve months of the Distribution Agreement (that is, September 23, 2008 through September 22, 2009), S.I.C. increased the sales of eBioscience products in Italy by 36%. S.I.C. accomplished this success notwithstanding a global recession that impacted the target customer base, production problems by eBiosicence, and competing direct sales by eBioscience in Italy. S.I.C. overcame these impediments by leveraging its more than five decades long reputation and its other product lines of interest to "stand behind" eBiosicence products in tough sales pitches and negotiations with S.I.C.'s institutional clients and scientists.

10.     S.I.C. would have never staked its reputation on its position as a supplier for eBiosicence if it knew that eBioscience would attempt to terminate the Distribution Agreement early without cause. In addition, S.I.C. entered into multi-year supply commitments with certain institutions that carry the risk of damages and penalties against S.I.C. should it be unable to supply the contracted products. A restriction or termination of the source of supply by eBioscience exposes S.I.C. to extensive damages and penalties that S.I.C. could have avoided if it knew that eBioscience would prematurely seek to switch suppliers in Italy.

11.     In October 2009, the month following the first year anniversary of the exclusive Distribution Agreement, eBioscience acquired Bender MedSystems ("Bender"), an Austrian company, to serve as eBioscience's European headquarters. At the time of the acquisition,

SDI-11823v1                                              3
**VERIFIED COMPLAINT**

Bender had a distribution relationship with a competitor of S.I.C. in Italy, Prodotti Gianni ("Gianni"). Apparently, eBioscience did not take steps as part of the Bender acquisition to ensure compliance with S.I.C.'s preexisting exclusivity in Italy for eBioscience products. Bender never requested the services of S.I.C. despite S.I.C.'s preexisting exclusive appointment in Italy for eBioscience's products. Shortly after the acquisition, eBioscience asserted for the first time dissatisfaction with S.I.C. and the purported right to terminate the Distribution Agreement.

12. eBioscience sent to S.I.C. a notice of termination of the Distribution Agreement dated December 1, 2009, and stating that the Distribution Agreement would terminate effective March 31, 2010. eBioscience sent this termination notice to S.I.C. less than fifteen months after eBioscience signed the Distribution Agreement, but just five weeks after its acquisition of Bender, including the relationship with Italian distributor Gianni.

13. S.I.C. disagreed with the notice of termination, and began discussions with eBioscience seeking an explanation and reconsideration. As part of those communications, eBioscience stated that its basis for termination of the Distribution Agreement was that S.I.C. failed to "meet or exceed the 700,000 EURO Annual Sales Target specified in Exhibit A" of the Distribution Agreement.

14. The "Targets" set forth in Exhibit A are for pricing determination only. The Distribution Agreement does not contain an obligation requiring S.I.C. to sell any minimum volume of products. S.I.C.'s obligation is "to diligently promote the Products." (*See* Ex. 1, § 1.) Accordingly, so long as S.I.C. diligently promotes the Products, the Distribution Agreement provides that the only penalty from failing to meet a "Target" is a reduction in the discount received by S.I.C. Under the Distribution Agreement, no particular level of sales can result in a breach.

15. S.I.C. demonstrated to eBioscience that its termination based on failing to meet a "Target" was unfounded, and that its termination notice was ineffective. S.I.C. documented to eBioscience that S.I.C. did meet the 700,000 Euro "Target." Also, S.I.C. pointed out that there is no minimum sales volume required in the Distribution Agreement. As to the "Targets" identified in the Distribution Agreement, according to the same Exhibit A referenced by S.I.C., failure to

meet those targets does not constitute a grounds for termination: if "an Annual Sales Target (12 months from the date of signing) is not met, then the discount rate is adjusted according to the schedule below until the one-hundred-percent (100%) sales target, end user sales, is achieved." (*See* Ex. 1 at Ex. A.)  Even though S.I.C. actually met the "Target" identified by eBioscience, and even though eBioscience has no right under the Distribution Agreement to terminate even if S.I.C. does not meet a "Target," eBioscience would not reconsider its termination notice.

16. While S.I.C. was in discussions with eBioscience regarding the termination notice, and months before the March 31, 2010 termination date unilaterally set by eBioscience, eBioscience began interfering with S.I.C.'s business relationships.  Through its agents and affiliates, including Bender and Gianni, eBioscience contacted S.I.C.'s customers regarding the termination of S.I.C. by eBioscience and informed them that Gianni would be the exclusive distributor of eBioscience products after March 31, 2010.  Gianni even began marketing eBioscience products on Gianni's website weeks before March 31, 2010.  This conduct by eBioscience and its agents tarnished S.I.C.'s reputation and made it very difficult for S.I.C. to continue to market eBioscience products and secure further orders.  As eBioscience knew, these communications to customers of S.I.C., including conservative biological, medical and life science research institutions, could be expected to result in a limitation or even an embargo on new orders.

17. Several S.I.C. customers, in fact, limited or embargoed new orders based on the communications they received from eBioscience and its agents long before the termination date eBiosicence itself set.  For example, Istituto Europeo Di Oncologia, Ordine Ospedaliero San Giovanni Di Dio and Universitá Vita Salute San Raffaele all cancelled orders following contact by eBioscience and/or its affiliates and agents.

18. eBioscience has placed holds or initiated delays on the supply of product to S.I.C., making it difficult for S.I.C. to meet its commitments under the Distribution Agreement, and further impacting S.I.C.'s commercial reputation.  Beyond the reputational harm, the restricting of product to S.I.C. materially impacts S.I.C.'s receivables because of the custom and practice for invoicing and payment in Italy.  Customers are not invoiced, and if they are, they do not pay, until

all items on a purchase order have been delivered. In several instances, S.I.C. was out of pocket having delivered significant portions of purchase orders, but eBioscience's restriction on supply has made it impossible for S.I.C. to complete those orders and invoice for payment. Currently, there are fourteen customers, representing tens of thousands of euros of eBioscience product that has been delivered by S.I.C. to its customers, which S.I.C. cannot invoice because of the hold on shipments imposed by eBioscience.

19. After discussions with eBioscience regarding the termination notice proved unproductive, and after eBioscience refused to modify its March 31, 2010 termination date or to take corrective action regarding its interference with, and disparagement of, S.I.C. in Italy, this verified complaint was filed.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment)

20. S.I.C. realleges and incorporates by reference the allegations set forth in paragraphs 1 through 19 as though fully set forth herein.

21. An actual controversy has arisen and now exists between S.I.C. and eBioscience concerning their respective rights and duties under the Distribution Agreement. eBioscience purported to terminate the Distribution Agreement effective March 31, 2010, because S.I.C. failed to meet alleged minimum sales volumes. S.I.C. disputes that it failed to meet minimum sales volumes under the Distribution Agreement, disputes that the Distribution Agreement can be terminated by eBioscience for the failure to meet any particular sales volume, and contends that it remains the exclusive distributor of eBioscience products in Italy beyond March 31, 2010.

22. Directly contrary to eBioscience's affirmatively stated contention, S.I.C. seeks a judicial determination that the Distribution Agreement is not terminated, and remains in full force and effect, on March 31, 2010 and thereafter, until its expiration on September 23, 2011, or until such time as it is properly terminated for one of the limited grounds set forth in Section 12(d) of the Distribution Agreement.

23. There is thus a justiciable controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of the declaratory judgment sought by S.I.C. regarding the Distribution Agreement.

**SECOND CAUSE OF ACTION**

**(Breach of Contract)**

24. S.I.C. realleges and incorporates by reference the allegations set forth in paragraphs 1 through 19 as though fully set forth herein.

25. eBioscience is under a contractual obligation to sell its products in Italy exclusively through S.I.C. in accordance with the terms of the Distribution Agreement.

26. In breach of the Distribution Agreement, eBioscience repudiated, both expressly and by its actions, the Distribution Agreement and disavowed that it had any obligation to honor the exclusive distribution rights granted to S.I.C. by the Distribution Agreement.

27. In breach of the Distribution Agreement, eBioscience interfered with S.I.C.'s performance of its obligations under the Distribution Agreement.

28. In breach of the Distribution Agreement, eBioscience entered into a corporate transaction infringing on S.I.C.'s preexisting right of exclusivity in the Italian market for eBioscience products.

29. eBioscience sold its products directly in Italy. In breach of the Distribution Agreement, eBioscience failed to pay S.I.C. the required commission on each such sale.

30. In breach of the Distribution Agreement, eBioscience sold product destined for the Italian market to distributors other than S.I.C.

31. S.I.C. has performed all of its contractual obligations under the Distribution Agreement, other than any obligations that were excused as a result of eBioscience's material breach of the Distribution Agreement.

32. As a direct and proximate result of eBioscience's breach of the Distribution Agreement, S.I.C. has been damaged in an amount presently uncertain but which exceeds the jurisdictional minimum of this Court.

1   33.   An award of monetary damages is inadequate to compensate S.I.C. for
2   eBioscience's breach of the Distribution Agreement given the unique nature of the exclusive
3   distribution rights granted to S.I.C. under the Distribution Agreement, and given its association
4   with S.I.C.'s reputation and standing among the biological, medical and life science research
5   institutional consumers for S.I.C.'s line of products.  The harm to S.I.C. of being denied the
6   exclusive right to distribute eBioscience's products is therefore difficult, if not impossible, to
7   calculate.  In the absence of an order of specific performance and injunctive relief, S.I.C. will
8   continue to engage in the incalculable harm to S.I.C. described above.

## THIRD CAUSE OF ACTION

### (Breach of Implied Covenant)

11  34.   S.I.C. realleges and incorporates by reference the allegations set forth in
12  paragraphs 1 through 19 as though fully set forth herein.
13  35.   The Distribution Agreement between S.I.C. and eBioscience contains an implied
14  covenant of good faith and fair dealing whereby eBioscience promised and agreed to do nothing
15  to deprive S.I.C. of the benefits of the Distribution Agreement.
16  36.   The actions alleged herein constitute a breach of the implied covenant of good
17  faith and fair dealing in that eBioscience unlawfully interfered with S.I.C.'s right to enjoy the
18  benefits of the Distribution Agreement.
19  37.   As a direct and proximate result of eBioscience's breach of the implied covenant,
20  S.I.C. has been injured and has suffered damages in an amount yet to be ascertained but which
21  exceed the jurisdictional minimum of this Court.
22  38.   An award of monetary damages is inadequate to compensate S.I.C. for
23  eBioscience's breach of the implied covenant of good faith and fair dealing in the Distribution
24  Agreement given the unique exclusive distribution rights granted to S.I.C. under the Distribution
25  Agreement, and given its association with S.I.C.'s reputation and standing among the biological,
26  medical and life science research institutional consumers for S.I.C.'s line of products.  The harm
27  to S.I.C. is therefore difficult, if not impossible, to calculate.  In the absence of an order of
28

specific performance and injunctive relief, S.I.C. will continue to engage in the incalculable harm to S.I.C. described above in breach of the implied covenant of good faith and fair dealing.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

39. S.I.C. realleges and incorporates by reference the allegations set forth in paragraphs 1 through 19 as though fully set forth herein.

40. At great expense and effort, S.I.C. has developed the Italian market for eBioscience's products since 2004.  S.I.C. accelerated the identification of new customers for eBioscience products in Italy and expanded efforts to market to existing customers of S.I.C. after execution of the Distribution Agreement.  S.I.C. increased its financial investment in marketing eBioscience products, in reliance on the exclusivity provision of the Distribution Agreement, its three-year duration, and the limited grounds for termination of the Distribution Agreement.

41. eBioscience now seeks to use the accrued benefits of the market S.I.C. established for eBioscience products in Italy for its own benefit while at the same time eliminating any obligation to S.I.C. under the Distribution Agreement which generated that benefit.

42. eBioscience would be unjustly enriched if it were allowed to take the benefit of the market S.I.C. established for eBioscience products without compensating S.I.C. for its efforts or honoring S.I.C.'s three-year exclusivity in the Italian market under the Distribution Agreement.

## FIFTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

43. S.I.C. realleges and incorporates by reference the allegations set forth in paragraphs 1 through 19 as though fully set forth herein.

44. At great effort and expense, S.I.C. has developed commercial relationships with biological, medical and life science research institutions in Italy.  The viability of these relationships depend to a large extent on S.I.C.'s reputation for reliability and stability.  S.I.C. reasonably expected these relationships to grow and gain substantial economic opportunities, benefits and profits for S.I.C.

45. eBioscience was aware of the relationship between S.I.C. and various biological, medical and life science research institutions to whom S.I.C. marketed and sold eBioscience's products. Given its focus in the same field, eBioscience has been aware of the importance of reliability and stability to commercial relationships with biological, medical and life science research institutions in Italy as well as elsewhere.

46. By early January 2010, and likely earlier, eBioscience and its agents and affiliates, including Bender and Gianni, began contacting S.I.C. customers in Italy to state that S.I.C. would no longer be a distributor of eBioscience products as of March 31, 2010. eBioscience knew that these communications would destabilize S.I.C.'s commercial relationships and make it difficult for S.I.C. to secure additional purchase commitments for eBioscience products and other product lines represented by S.I.C.

47. At the same time as eBioscience, its agents and affiliates were raising questions about the reliability and stability of S.I.C. with S.I.C.'s customers, eBioscience also began curtailing supply of products ordered by S.I.C. to make it difficult for S.I.C. to timely perform its obligations under purchase orders between S.I.C. and its customers.

48. At the time of eBioscience's interference with S.I.C.'s commercial relationships, eBioscience knew that S.I.C. disputed termination of the Distribution Agreement, and eBioscience knew that its purported termination of the Distribution Agreement was unlawful and unjustified.

49. As a consequence of eBioscience's interference, S.I.C. has suffered lost corporate opportunities, profits, and benefits, and is entitled to damages, as allowed by law, in an amount to be proven at trial. For example, S.I.C. customers have expressed concern about further commitments, and in some cases, have indicated that they cannot commit to purchases from S.I.C. because of the conduct of eBioscience and its agents.

50. By reason of the intentional, knowing, deliberate, oppressive, fraudulent and malicious conduct of eBioscience, S.I.C. seeks and is entitled to punitive damages.

## SIXTH CAUSE OF ACTION

**(Trade Libel)**

51. S.I.C. realleges and incorporates by reference the allegations set forth in paragraphs 1 through 19 as though fully set forth herein.

52. At great effort and expense, S.I.C. has developed commercial relationships with biological, medical and life science research institutions in Italy. The viability of these relationships depend to a large extent on S.I.C.'s reputation for reliability and stability. S.I.C. reasonably expected these relationships to grow and gain substantial economic opportunities, benefits and profits for S.I.C.

53. eBioscience has been aware of the relationship between S.I.C. and various biological, medical and life science research institutions to whom S.I.C. marketed and sold eBioscience's products. Given its focus in the same field, eBioscience has been also aware of the importance of reliability and stability to commercial relationships with biological, medical and life science research institutions in Italy as well as elsewhere.

54. By early January 2010, and likely earlier, eBioscience and its agents and affiliates, including Bender and Gianni, began contacting S.I.C. customers in Italy to falsely state that S.I.C. would no longer be a distributor of eBioscience products as of March 31, 2010. eBioscience knew that its contact with S.I.C.'s customers regarding a change of distributors many months before the purported change would be understood by S.I.C.'s customers as a negative statement regarding the reliability and quality of S.I.C.'s services in the interim and thereafter. eBioscience disparaged S.I.C. to its customers in this manner all the while it knew that its termination of the Distribution Agreement was pretextual and not grounded in fact when it falsely represented that S.I.C. would lose its position as exclusive distributor by March 31, 2010.

55. As a consequence of eBioscience's disparagement, S.I.C. has suffered lost corporate opportunities, profits, and benefits, and is entitled to damages, as allowed by law, in an amount to be proven at trial. For example, S.I.C. customers have expressed concern about further commitments, and in some cases, have indicated that they cannot commit to purchases from S.I.C. because of the conduct of eBioscience and its agents.

56. By reason of the intentional, knowing, deliberate, oppressive, fraudulent and malicious conduct of eBioscience, S.I.C. seeks and is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, S.I.C. requests that the Court enter judgment in its favor and against eBioscience as follows:

1. A declaration that the Distribution Agreement remains in full force and effect on March 31, 2010, and thereafter, until its expiration on September 23, 2011, or until such time as it is properly terminated for one of the limited grounds set forth in Section 12(d) of the Distribution Agreement.

2. A declaration that failure to meet an Annual Sales Target set forth on Exhibit A to the Distribution Agreement is not a breach giving cause for termination of the Distribution Agreement.

3. An order that eBioscience specifically perform on its obligation to sell product in Italy exclusively through S.I.C.

4. A temporary restraining order, a preliminary injunction and a permanent injunction, all requiring that eBioscience and its agents, servants, employees, affiliates, and all persons in active concert or participation with any of them:

    a. Refrain from breaching, interfering with and/or infringing S.I.C.'s exclusive distribution of eBioscience products in the Italian market pursuant to the Distribution Agreement;

    b. Refrain from marketing and selling eBioscience products in Italy, either directly, or through any distribution channel other than through S.I.C.;

    c. Refrain from shipping eBioscience products destined for the Italian market to anyone other than S.I.C.;

    d. Refrain from interfering with the supply of eBioscience products to S.I.C.;

    e. Refrain from rejecting, or accepting and not fulfilling, any orders by S.I.C. for eBioscience products; and

    f. Refrain from disparaging S.I.C. to biological, medical and life science

research institutions in Italy or elsewhere.

5. An award of damages sufficient to compensate S.I.C. for eBioscience's breach of the Distribution Agreement in an amount to be determined at trial.

6. An award of damages sufficient to compensate S.I.C. for eBioscience's interference with S.I.C.'s economic relationships in an amount to be determined at trial.

7. An award of damages and restitution to be determined at trial in the amount necessary to prevent the unjust enrichment of eBioscience.

8. An award of damages to be determined at trial in the amount necessary to remedy the financial harm suffered by S.I.C. as a result of eBioscience's disparagement.

9. An award of punitive and exemplary damages to S.I.C. as allowed by law, and in the amount to be determined at trial.

10. That S.I.C. be awarded all costs incurred in this proceeding as well as reasonable attorneys' fees; and

11. That S.I.C. be granted all other and additional relief to which it is entitled, and which the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

S.I.C. hereby demands a trial by jury under Rule 38(b) of the Federal Rules of Civil Procedure on all issues triable by a jury.

Dated: March 24, 2010

JONES DAY

By: *s/ Jose L. Patiño*
Jose L. Patiño

Attorney for Plaintiff
SOCIETÀ ITALIANA CHIMICI SRL

## VERIFICATION

I, Dr. Oliviero Promontorio, am Managing Director of the Società Italiana Chimici Srl, a party to this action. I am authorized to make this corporate verification for and on behalf of the Società Italiana Chimici Srl, and I make this verification for that reason. I have read the foregoing document entitled **Verified Complaint** and know its contents. I am informed and believe, and on that ground allege, that the matters stated in the **Verified Complaint** are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 24, 2010 in Rome, Italy.

SOCIETA' ITALIANA CHIMICI
DIVISIONE SCIENTIFICA s.r.l.
l' Amministratore Unico
Dr. Oliviero Promontorio

_____
Dr. Oliviero Promontorio

SDI-11823v1

**VERIFIED COMPLAINT**

**EXHIBIT 1**

DISTRIBUTION AGREEMENT

The Agreement ("Agreement"), effective as of date of last signature below, is by and between **eBioscience** ("eBioscience"), having its principal place of business at 10255 Science Center Drive, San Diego, California, 92121, USA **Società Italiana Chimici Srl** ( the "Distributor"), having its principle place of business at Via Rio nell'Elba 140 - 00138 ROME / ITALY.

WHEREAS, Distributor desires to obtain distribution rights to purchase, distribute and sell eBioscience Products (as defined below) to end-user scientists in **Italy** ( the "**Territory**"); and

WHEREAS, eBioscience will retain its rights to ship directly to end-user scientists in the Territory if it is the preference of such end-user scientists;

WHEREAS, eBioscience desires to supply Distributor with said Products at the agreed prices and conditions as set forth below.

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, intending to be legally bound thereby, the parties hereto agree as follows:

1. **Appointment.** eBioscience appoints Distributor as its **exclusive** distributor for Products in the Territory, subject to achieving exclusivity performance milestones. Distributor hereby accepts the appointment and agrees to diligently promote the Products of eBioscience and to build market share for eBioscience Products, with activities including but not limited to: active support of pertinent trade-shows, account management, lead finding, and promotion of new products as they become available. Distributor shall not further distribute eBioscience products to non-end users; the Products are for "Research Use Only" by Distributor's customers. No right is conveyed for sales or distribution of Products by Distributor's customers. In the event that the products are improperly exported to another Territory by Distributor or distributor's customer(s), eBioscience shall have the right to immediately terminate the agreement and Distributor shall be solely liable for legal expenses and/or punitive damages incurred by eBioscience in enforcing and repairing such unauthorized distribution actions. eBioscience agrees to terminate appointments of all other active Distributors currently servicing the Territory according to reasonable and customary termination clauses contained within active agreements upon receipt of executed documents from Distributor.

2. **The Products.** Products shall consist of all reagents manufactured by eBioscience. From time to time, eBioscience may distribute certain materials from other suppliers. Such products may be available to Distributor at a different price schedule than eBioscience-manufactured Products, at eBioscience's sole discretion. eBioscience may at any time, and at its sole discretion, exclude from this Agreement "Competing Products." "Competing Products" shall be defined as any similar product carried by Distributor that is manufactured by companies other than eBioscience, including but not limited to, BD Biosciences Pharmingen, Caltag (Invitrogen), R&D systems, Biolegend, Abcam, Santa Cruz and Imgenex.

3. **Purchase Price & Payment Terms.** eBioscience agrees to supply Products to Distributor at a **thirty** percent **(30%)** discount from eBioscience's current European list price at the time of Distributor's placement of order (the "Distributor Discount"). Distributor's discount code is "**SIC030**"; this code is to be supplied when orders are placed to ensure that eBioscience's orders processing group is aware of the distribution agreement and discount structure.

Such discounts are contingent on payment of order by cash, *specifically excluding credit card payment,*

within 30 days of date of invoice ("Net 30 Days"). Should Distributor prefer to make payment via credit card, such discounts will be reduced by four percent (4%) to cover the extra processing fees for such payment method. Distributor shall have a credit limit of $50,000 and must not have any open balance in excess of this amount. eBioscience reserves the right to adjust its European list prices at any time, and may engage in promotional pricing as mutually agreed upon in order to achieve competitive advantage or share conversion. All incremental discounts above the Distributor Discount shall be of defined duration, with distributor and eBioscience each sharing 50% of the burden of such increased discounts.

Late Payments: Distributor's discount will be considered void on any past due invoices, and such invoices will be billed using eBioscience's full list price; there shall be no grace period or allowances.

4. **Milestones.** eBioscience has established sales targets and minimums for Distributor to achieve during the term of this Agreement, attached as Exhibit A. In order to remain in compliance with this Agreement and receive the discount specified above, Distributor agrees to growth target and performance adjustments specified in Exhibit A.

5. **Direct Shipments.** From time to time certain customers identified by Distributor may benefit from direct shipment from eBioscience. In these situations, eBioscience agrees to invoice the customer directly, and pay a sales commission based on the invoice amount net of any shipping costs. The amount of sales commission shall be equivalent to the discount rate in effect at that time, subject to any modifications according to Exhibit A.

6. **Forecast & Communications.** Distributor agrees to provide non-binding quarterly sales forecasts to facilitate eBiosciences production planning. Forecasts shall be provided in an aggregated revenue format only. Distributor agrees to share appropriate competitive information with eBioscience in a timely fashion, and agrees to provide eBioscience with a copy of their marketing communications vehicles, including local currency pricing. Distributor agrees to provide advance information regarding any product specific promotions that might materially impact eBioscience ability to supply. eBioscience agrees to advance information as appropriate regarding top sellers and planned promotional activities.

7. **New Product Identification:** Distributor agrees to notify eBioscience of any product licensing leads relevant to the normal course of business. In the event that the new product leads are confirmed to be unique and are subsequently commercialized by eBioscience, a finders fee equal to 2% of the first years global product sales will be paid to the Distributor. New leads shall be submitted via the eBiosciences new product request web interface.

8. **Warranty and Performances.** eBioscience warrants that all Products shall conform to, and perform in accordance with the product specifications and the descriptions thereof. Product specifications are contained within the technical data sheet of each Product. In the unlikely event that there is a product defect originating from the manufacturing of the Product, eBioscience shall be obligated to correct or replace any Product which fails to meet Product Specifications within thirty (30) days provided that Distributor has made such notification within fifteen (15) working days following receipt by Distributor.

9. **Handling & Storage of Products.** Distributor is responsible for paying all product-shipping charges and agrees to properly store and handle Products upon receipt in accordance with eBioscience's instructions, including maintaining the product at the appropriate temperature while in transit to Distributors end user. In addition, Distributor recognizes that eBioscience routinely performs post-bottling quality control to ensure the quality of Products. Therefore, to maintain the consistency of Products, Distributor agrees to not rebottle or tamper with Products in any way. If samples are desired by Distributor, eBioscience shall make efforts to accommodate the needs of Distributor's customers up

to an equivalent list price value of 2% of Distributors annual sales.

10. **eBioscience Trademarks**. Distributor will acknowledge in all promotional and technical materials involving eBioscience Products, the use of eBioscience's logo(s) and product name(s). Distributor further agrees to specifically identify eBioscience as the manufacturer of Products on all such promotional and technical materials; for example:

   Product description "eBioscience purified anti-mouse CD3e" or the product description is hyperlinked to the appropriate data sheet: http://www.ebioscience.com/ebioscience/specs/antibody_14/14-0031.htm

11. **Duration of Agreement**. This agreement shall be effective for duration of thirty-six (36) months from the effective date and may be extended with the express written consent of both parties.

12. **Miscellaneous**:
    a) This Agreement is deemed to have been entered into in California and its interpretation, construction, and the remedies for its enforcement or breach shall be according to the laws of the Sate of California.
    b) Force Majeure events: Neither eBioscience or Distributor shall be liable for failure to perform any obligation under this Agreement due to causes which are beyond its control, and of a nature which it shall have no power to remedy. Such force major events shall include, but are not limited to, acts of Gods, flood, fires, epidemics, as and riots.
    c) This Agreement does not create an employer/employee relationships, joint venture, nor partnership, between the two parities.
    d) Either party may terminate this Agreement in the event the other party failed to perform or otherwise breaches any of its obligations hereunder (except as otherwise provided in section 8b). The party desiring to terminate must provide the other party at least thirty (30) days written notice of termination.
    e) eBioscience will provide Distributor with desired quantities of its marketing materials including catalog, posters, brochures and other materials at eBioscience's cost of production. Distributor is responsible for shipping and handling charges.

**In WITNESS WHEREOF, the parties hereto have set their names on the dates set forth:**

eBioscience                                              Societá Italiana Chimici Srl

By: _____                                By: _____
Name: Tony Ward                                          Name: Dr. Oliviero Promontorio
Title: Vice President Operations                         Title:   General Manager
Date:   August 22nd  2008                                Date: September 23, 2008

**Exhibit A**

1. **Performance Adjustment.** eBioscience agrees to supply Products to Distributor at the Distributor Discount on all orders, with maintenance of this discount rate contingent upon Distributor meeting its Annual Sales Targets. If an Annual Sales Target (12 months from the date of signing) is not met, then the discount rate is adjusted according to the schedule below until the one-hundred-percent (100%) sales target, end user sales, is achieved.

|  | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Annual Sales Targets (Euro) | 700,000.00 | 950,000.00 | 1,250,000.00 |

| Growth Target (%) | Performance Adjustment for Period |
|---|---|
| >/= 100 % | -- (30% discount) |
| >/= 98 % | 29% discount |
| >/= 96 % | 28% discount |
| >/= 94 % | 27% discount |
| >/= 92 % | 26% discount |
| >/= 90 % | 25% discount |

*Sales are end user sales in Euro.